Mr. Dunlap, will you be starting? I will be, Your Honor. Good morning, Your Honors, and may it please the Court. In the short time I have available, I'd like to deal with two issues, the patentability of Claim 9 of the 034 patent over the Arduini and the Abbey references, and let me start with Arduini. The principal focal point of our argument is Figure 2 of Arduini. Dr. Schlecht, who is the inventor of the 034 patent, admitted that everything in Claim 9 is disclosed in Arduini except for two elements, a switching controller and a 12-volt source voltage. If you look at Figure 1 of Arduini and you look at the whole paper in Arduini, the whole paper is a universal DC-DC converter. It discloses in Figure 1 what the different options are. There are only four options for the controller, one of which is no controller, so basically you're reduced to picking one of those four options, and I suggest that that is the full equivalent of an anticipation, much as in the Kripholz case where you had a Figure 17 and the issue was whether the light source could be another light source, and the Court mentioned that there were three other light sources, and they referred to that particular figure as the starting point, and that is true here. The 12-volt issue is in the background of the invention in Column 1. It mentions 12 volts among two other voltages. Dr. Schlecht admitted that it was common for non-isolated load converters to use 12 volts. The Mimano reference teaches switching converters with 12 volts, and I suggest the 12 volts could not have been more obvious. Now, Arduini is kind of a laundry list of a lot of different alternatives, not giving the advantages of any single one, and we all understand it really doesn't teach this plurality of non-isolated switching registers. Why would a person of skill in the art make the choices that you say they would make? Your Honor, there are only four choices of regulators, one of which is none. The Supreme Court has a finite number of predictable solutions, then that is enough to satisfy the requirements of the statute. Mr. Connolly, you're arguing obviousness. Was that argued to the jury? Pardon? Was obviousness argued to the jury? Yes, it was, Your Honor. It was argued on page A1600 of the appendix. You will find that Arduini is specifically mentioned and obviousness is specifically mentioned. I know that Sinclair has taken the opposite view. If you look at A1600, I think you will find that I am right. So, I submit that under KSR, you not only have a finite number of predictable solutions, but as to the 12 volts, you have predictable use of prior art according to established functions, but they make a number of arguments. One of their arguments, oh, and incidentally, the obviousness... But wouldn't a person of skill in the art be motivated to use the 4 volt rather than the 12 volt? No, Your Honor. So, you're making two or three changes here. You've got to first get to the multiple non-isolating regulators, and then you've got to choose the 12 over the 4, which a person of skill in the art would be pushed towards the 4, wouldn't they? Your Honor, no, a person would be not pushed to 4. First of all, the figure 2 shows multiple regulators, so that's not an issue. The issue is would you use a switching regulator rather than a linear regulator, so that is an easy choice. The 12 volts is mentioned in multiple places. Dr. Schleff says that that is a common, it was a common voltage for non-isolated load converters. You've got the Mammano reference, which shows that 12 had a higher efficiency than the other two voltages mentioned. You have the AMPSS, which shows regulators with 12 volts. The record, I submit, is overwhelming that 12 volts would be the choice. Would you deal just briefly with more secondary considerations than we generally see in a case, long felt need, failures of others, unexpected results, and so forth? I would and I will, Your Honor. The case law makes it clear that when you're looking at invention that differ from the prior art. Dr. Schleff said there's only two parts of this claim invention in claim 9 that isn't shown in Arduini. One is the switching regulators and one is the 12 volts. There is no evidence that any commercial success, that any secondary consideration is tied to either or both of those two elements, and we submit that secondary considerations does not get them very far. They also argue that a witness, Dr. Mercer, said that figure 1 shows an infinite number of... But if those features make the whole... Pardon, Your Honor? If those two features make the invention as a whole work much better, why can't we consider those features as part of the secondary considerations? You're kind of dismissing because they haven't linked them to those specific features, but we understand those features bring advantages and those advantages are closely tied to the unexpected results, commercial success, and so forth. Your Honor, they haven't suggested that those features are tied to the unexpected results. They haven't argued that those features are tied to commercial success, and moreover, those features don't give you unexpected results. They give you expected results. The Prior Act teaches that 12 volts is more efficient and is a common usage. The Prior Act teaches that switching regulators are better than linear regulators. In fact, Dr. Schlecht himself said in a paper that he authored, which is at A5398, that switching regulators are more efficient than linear regulators. So there's nothing unexpected here. There's nothing new here. There's no long-felt need. I submit that the arguments that they make do not hold water, and I submit further that analogously to the cripples case, there could not be a clearer case of what is almost exactly in anticipation, but for the 12-volt, arguably, limitation, which is well taught by Dr. Schlecht and by the Prior Act. And I see that I have only 28 seconds left, and I want to save two minutes for rebuttal. So unless there are some questions, I will rest. Thank you, Mr. Senator. Mr. Schmidt, will you be next? Yes, Your Honor, I will be. Good morning, Your Honors. May it please the Court. I'm going to deal ambitiously with three issues. First, non-infringement. Second, the preclusion of damages evidence. And I think invalidity would take the most time, so I'm going to deal with that last to make sure I cover the first two issues. So first, dealing with non-infringement. Claim construction, as this Court knows, is a matter of de novo review. The issue is very small here. The dispute is whether isolation in a converter is determined only by what's inside the converter. There's no dispute that an isolated converter can be made non-isolated. In other words, the isolation is defeated by adding an electrical connection between the input ground and the output ground. Now, there's no dispute that if you make that connection between the input and output ground inside the converter or stage, it becomes non-isolated. The only question is if you make that connection outside the stage, does it still defeat isolation? And so if you think about it, you have an input ground and an output ground. A connection is made between those inside the converter. We all agree that makes the converter non-isolated. Now, those input and output grounds run out of the converter on the circuit board to tie into the rest of the system. If I make that connection just outside the converter or stage, I still have a connection that allows electrons to flow from the output ground to the input ground, in other words, back into the converter. And if I stretch that connection and just have it run across the printed circuit board to the edge of the printed circuit board and make the connection there, we have the same thing. Electrons can still flow from the output ground to the input ground back into the converter. And that's the dispute here. And in fact, we have an actual test that proves it. The experts went to Cisco, did an inspection. This is both Syncor's expert and the defendant's expert, Dr. Callahan. And they actually put a resistance meter on the input and output grounds of the converter on the board. Wasn't this a jury verdict? Yes, it was, Your Honor. Is this a question of fact? In fact, Your Honor, let me take that back. No, this was a grant of partial summary judgment on this issue. You're talking about where the district court basically ruled in favor of Syncor and concluded that isolation meant differently than, as the defendants argue, the trial? Is that what you're... Then we argued the claim construction. Claim construction, right. Exactly. We got a claim construction that said isolation is the absence of electrical path. And the court added on within the stage, the court added on specifically between an output of a particular stage component of circuit. That was later in the context of partial summary judgment, the court very quickly... But the patent uses the term isolation in the context of stages, right? And each stage is isolated. Except if you defeat the isolation. Just as the prior Weinberg circuit and the prior Push-Pull circuit show, you can add a connection to defeat the isolation. Yeah, you want to say the whole device is grounded so it's not isolated, but doesn't that mean that you'd read the preferred embodiment out of the patent? No, Your Honor. In the patent, you have a regulation stage, which is not isolated, and there's a connection between the input and the output. So there's nothing inconsistent with this. What we're talking about is these experts went to Cisco, they put an ohmmeter on the input and output of the converter. And for one of the boards, they found it was 500 megaohms of resistance between the input and the output. And that's at A30279. For another one, they found 4 megaohms of resistance. Clearly, that's not a path. They then put the board into the rack, which is how these devices are sold, measured the resistance, it was less than 0.3 ohms at the input and output of the converter. 0.3 ohms is essentially no resistance at all, meaning an electrical path had been created between the input and the output of the bus converter. And the bus converter is the stage for the converter we're talking about. So the actual resistance test showed that if you make this electrical connection at the edge of the circuit board, it does affect the isolation within the circuit stage or converter, whichever term you use. And, Your Honor, I'd like to move now to the preclusion of damages in lieu of time. We, under grain processing, should have been able to put in evidence, all of the evidence, that a non-infringing substitute was available at the time of the infringement. As this court noted in grain processing, without this type of evidence, the damage analysis is quite skewed. And that's what happened here. All the defendants' revenue combined was $31.3 million. The profit for all the defendants combined was $3.1 million, yet the jury awarded lost profits of $86.4 million and an additional royalty of $8 million for a total of $94.4 million, even though the defendants had only profited $3 million and their total revenue was $31. This is exactly what the court was referring to in grain processing when it said, a rational would-be infringer is likely to offer an acceptable non-infringing alternative rather than leave the market altogether. Fully regulated converters were on the market. That was Syncord's very first product. It predated the unregulated. It was sold the entire time period. But the unregulated, because it didn't have regulation, could be cheaper. And so Cisco set about designing boards, creating a very little teeny space on the board for this particular unregulated converter. The unregulated converter was optimized for the board. There was no reason to also use a fully regulated because it would be more expensive by adding the regulation circuitry at cost. But wait, wasn't the fully regulated product, the more complete product, didn't it offer features that the unregulated product didn't offer? It did offer the additional feature of regulation. But in this two-stage converter, you also have regulation on the next stage. So Cisco testified it didn't care whether or not it was unregulated or regulated. What Cisco wanted was the least expensive, most efficient, and multiple sourcing. In the but-for world, you lose multiple sourcing, and Syncord demanded two or three times the price in the but-for world. So those advantages are stripped away. So what Cisco actually did in the summer before trial, when the but-for world was coming to be a reality, is it put out RFQs to defendants to optimize fully regulated converters to be dropped in replacements. And this process went on throughout the fall. The records were disclosed and discovered. It was in the expert reports. It was talked about in the expert depositions. But when we got to trial, that evidence was precluded. We brought to trial, or I should say Cisco sent to trial, Bob Ballinger, the man who had designed in the first place and overseeded the entire time period. And he said, he would have said, based on the offer proof, that if I had been faced with a sole source, a small company in Massachusetts, at double or triple the price for the next 12 years, which is the lifetime of the patent, that I would have switched to fully regulated in that we had fully regulated examples in place being provided to Cisco before trial. In fact, Cisco even placed a purchase order for additional prototypes to put through their qualification testing. They have a standard qualification testing. You've got to measure the heat. You've got to put it on the board. You do the testing, et cetera, et cetera. We were already into that prototype testing by the time of trial, and yet that did not come in. We're not asking this court to find that these are acceptable non-infringing substitutes. We're just asking the court for a remand to allow us to present that evidence. That evidence was presented in green processing. It was even presented in the Siemens case. In the Siemens case, the court went the other way, but the evidence was allowed to be presented. And that's what we should have been able to do here. And without having a non-infringing alternative available, SIDNCOR was able to argue there are no non-infringing alternatives. Was there a non-infringing alternative on the market? The fully regulated was on the market before the unregulated was on the market. The only difference was it hadn't been optimized to drop into that particular place on the circuit board that had been designed for the unreg. But that's because there was no need. Cisco knew the fully regulated was more expensive, just like in the green processing case, and so it chose to continue with the unregulated converter. And as far as invalidity, because I see I'm out of time, we presented the fact that the buck converter is actually disclosed in the reference. There's no dispute about that. A buck converter is non-isolated. And I also wanted to advise the court that with respect to the reexaminations that are ongoing, the 190 patent is now set for argument at the Does that have any relevance at all? It does in the sense, Your Honor. Any relevance at all to this proceeding? It does in the sense, Your Honor, that we have asked in the past and will ask again to consolidate the appeal from the patent office with this appeal. Any relevance at all to this appeal? Thank you. How can it be consolidated when it's at the board? It hasn't been decided there. This case is well along. The board decision will come out in one to two months. But we don't have to consider that. I mean, it's not right, and the law makes it clear that's an independent proceeding which has no applicability. You're absolutely right. In Injury Translogic, the two were consolidated, so it has happened in the past, and that's why I mention it. Thank you, Your Honor. Thank you. Mr. Bertinkus, are you next? Yes, I'm batting cleanup, Your Honor. Actually, you're third. I don't think that's cleanup. Well, cleanup for our side. Thank you, Your Honor, and may it please the Court. I want to address both the damages issue and inducement. Let me start with damages and pick up where my colleague, Mr. Smith, left off. He was talking about damages evidence that was not introduced, not allowed to be introduced. Let me step back and talk about why the lost profits award is invalid under the evidence that was introduced. As Mr. Smith noted, the verdict to the judgment here is quite extraordinary. The defendant's profits for the sales during the pre-verdict period were $3.1 million, but the lost profit award is $86.4 million, more than 28 times as much. So plaintiff's claim is that the patent's market power is so strong that it could more than triple the market price and lose only a few sales to an alternate product. This was clearly a price erosion case, yes. It was a price erosion case, and as Your Honor, as the Court knows under the Court's precedence, price erosion is permissible, but the Court has been quite specific that the burden is on the plaintiff to provide sound economic proof, as the Court has said several times, not mere speculation. Well, excuse me, wasn't there sufficient evidence to support price erosion in the trial because it was a differential between what the defendants were selling the product for, which was about $24, and what Sinclair would have sold for, but for the infringement of $81? And wasn't that differential sort of the driving force that led the jury to make the award amended? You're right, Your Honor, that that differential is the entire basis of Sinclair's case. The problem is that that differential is based entirely on sales in 2010 to Cisco of 18,000 units, about one one-hundredth of the total amount at issue here, which all the evidence makes clear happened because of a freak shortage in the market. What the record shows, and this is what both the Cisco witness, Mr. Ballinger, testified to, and the inventor, Mr. Schleck, testified to, was that these prices were the result of a short-term lack of availability because there was a production curtailment, the 2008-2009 recession had happened, plants had been shut down, there was a spike in demand, and for that short period there was nowhere to get the units, and so Cisco paid this price. Everyone agrees that that's what happened, and we submit that's an insufficient basis for saying that this price would have prevailed for this entire four-year period. Mr. Ballinger testified he would not have paid that price, and Dr. Schleck testified that this price... Mr. Reed testified as well that when these products first entered the market, they were entering it at a range between $60,000 and $110,000. He did, Your Honor, although he specifically did not rely on those prices for his pricing model. His benchmark, which he says specifically, was based solely upon these 2010 prices, and we think for good reason, those prices when they were just entering the market, there were very few sales, people were looking at the product, no evidence that those prices certainly would have prevailed for the entire four-year period. Well, wasn't there evidence at trial that Syncor made sales during the 2005-2008 period at much lower prices, and that while the 2010 sales may have sort of been in a different situation, doesn't that relate back to the earlier time frame, and wasn't there evidence at trial to support that the prices were suppressed during the time frame, covered by the damage award? Well, Syncor's claim is that the prices during the 2005-2008 period were suppressed. That's why they didn't rely on them. It was their burden to come forward with some evidence of what the prices would have been, sound economic evidence, as the court has said, in order to meet the standards for proving price erosion, and the problem is all they've come forward to are these very few sales and a freak market shortage. They don't have anything else to support the idea that for four years, these would have been the prevailing prices, and that's the sales law in their lost profits price erosion claim. There's a second problem in that even if they had come forward with some prices that were legitimate, which we say they haven't, they also would have had to show the absence of alternatives. That's what the court has said in its cases. There is some generalized evidence about the benefits of their product compared to the alternatives that were available. All of the non-Syncor witnesses mention, however, that lower price is one of the key differentiators. So that evidence certainly is not sufficient by itself to say that some very, very high multiple of the existing price would have been sufficient. And there certainly is lots of evidence in the record, and we cited on our briefs, that other customers used fully regulated, that they could use it, and that Syncor itself actually marketed fully regulated as an alternative. So the flaw here is no evidence that these freak 2010 prices could prevail during the period, and the rest of the evidence certainly doesn't show that there weren't alternatives. To the contrary, it shows that there were alternatives available, and Syncor certainly didn't carry its burden of saying that the price elasticity was so low that it could have charged three times the gross price and not lost any but a few sales. And, again, this is all without the question that my colleague talked about, about the evidence that was excluded. Let me turn, if I may, to the inducement issue. This involves about $21 million in pre-suit damages. As the court knows, Global Tech held that an element of the claim of inducement is knowledge of the existence of the patent. This case was tried before Global Tech, and the district court refused an instruction informing the jury of that requirement. But Global Tech really didn't change the law. It just sort of restated it. I mean, there really isn't any substantive law difference between when these jury instructions were formulated and when Global Tech came in in 2011, right? No, Your Honor. I think Global Tech did dramatically change the law. Because the way this case was tried, plaintiffs argued that disregard of a known risk was sufficient to meet the standard for inducement, and Global Tech specifically, the Supreme Court specifically, rejected that argument and said no knowledge. But the jury found that each defendant was liable for contributory infringement, therefore finding that each had actual knowledge because the instruction required the actual knowledge. Yes, Your Honor. They would have had to find actual knowledge under contributory infringement. They therefore found actual knowledge, and doesn't that carry over to the inducement, regardless of any technical flaw in the instruction? Several answers, Your Honor. First of all, contributory infringement was a side issue in this case. This case is all about sales outside the U.S. But they found actual intent for each defendant. They did, but the contributory infringement instruction didn't direct them to find that pre-suit or post-suit. That wasn't a focus of the contributory infringement arguments the way it was a great focus of the inducement arguments. But the instructions told them you had to have actual knowledge, right? The instructions told them they had to have actual knowledge. So they found it. But it is not clear from that that they found actual knowledge prior to the filing of the suit, and that is the critical question for this large chunk, $21 million, of inducement damages, Your Honor. Let me – well, let me raise one other issue, because I think my colleague will say that even the inducement instructions had an actual knowledge element. It certainly didn't. And the language of the instruction on inducement itself negated an actual knowledge requirement by saying that there was liability, if I may, Your Honor, for one more second, that there was liability if the defendants knew or should have known that their actions would induce, therefore obviating an actual knowledge requirement, and then going on to say that there would have been – that the plaintiffs had to show that there was no liability – I'm sorry, that the plaintiffs had to show that the defendants knew or should have known that their actions would have induced actual infringement. That's the language I'm talking about, and that is a real problem in terms of vitiating the inducement finding. Thank you. Okay. Thank you, Mr. Pincus. Mr. Phillips, we will hear from you. Good morning, Your Honors. Somehow it seems particularly fitting that we're sitting in a district court because my sense of the arguments that were just presented is that they've been asked to revisit the jury's decision in this particular case and to reweigh the evidence, and clearly that's not your function in this proceeding, and hopefully the court will recognize as much. I'll address each of their arguments and hopefully be able to give you back at least a portion. Can I start you at the back? Of course. In something they didn't really point to, but there was an enhancement here. Based on what? On the fact that in the period of time after the verdict came in and before the injunction was issued, that there was an enormous increase in the sales of the products. Those were infringing products that they knew were infringing. Yes, I remember those findings, but usually enhancement is based on willfulness, which was not found here. Well, egregiousness. Did they have willfulness to allow an enhancement of damages? Well, the district judge found that the conduct here was egregious. Egregious was the word he used. I think implicit in that is to the extent that willfulness is a technical requirement, which I'm not 100% sure it is because there's nothing in the language of the statute that says willfulness. It just talks about an extraordinary case. It seems to me that what he's saying is these are extraordinary circumstances and that this court has routinely recognized in situations like this where somebody continues to engage, not only continues to engage in the infringement, but does so in an accelerated way and it causes independent injury because of the lost opportunities that our clients suffered as a consequence of that, both in terms of, obviously, the market share, but the reputation in the industry lost during that period of time. So when the injunction actually gets reinstated, we're in a hole already that's been created under those circumstances. It seems perfectly permissible to say that that's a reasonable sanction to impose in these circumstances. Let me go through the arguments as my colleagues have laid them out. Mr. Donner focused primarily on Arduini. It was a little unclear to me because he seemed at some points to be arguing anticipation as opposed to obviousness, which is the only issue as I read his appeal is that it is obviousness. It's important to put in context here, though, that they had no expert testimony in this case on obviousness. They only had it on anticipation. And whatever else you can say about this technology, it is not the stuff that lay people can make sense out of. I mean, I've been studying this stuff now for the better part of six weeks, and the idea that any aspect of this is obvious to me is beyond anything anybody could imagine. Judge Ray, you specifically identified the point that I thought was the most telling, which is where Dr. Schlecht specifically testified about the 12-volt versus the 4-volt. I mean, if that's not a classic question for the jury, I don't know what is. He gave them exactly what he said. It's not obvious under those circumstances. With respect to the secondary meaning, this court has never required the secondary meaning to be just attached to the most trivial aspects of differences with the prior art. What it's talked about is when you're adding on to an existing invention or an existing product and you put in a very small add to it, under those circumstances you have to show your really small add has made a difference to a product that otherwise was just doing gangbusters. Is there any point of nexus here between the claimed invention and the many secondary considerations? Oh, absolutely, because the claimed invention, the subject matter of this claimed invention, is this extraordinary architecture that no one had ever anticipated, had even conceived of, and indeed everybody thought would be exactly the opposite, and then the bus converter that implemented it. The second isolation is what you're talking about. Exactly, and so to my mind the evidence was directly there. It became their burden at that point to come in and say there was some other explanation under those circumstances. With respect to the claimed construction that Mr. Smith argued, the isolation stage, the isolating converter, they asked for the construction of isolation. They got the one they wanted, not the one we wanted. Those are used as adjectives. It's clearly within the stage of the converter, and the notion, and he talked about what happens if it were just outside. Well, that might make an interesting issue, except that these are nowhere near just outside. These are grounding wires for a fundamentally different purpose, not remotely cast out on the infringement in this case. With respect to the non-infringing substitute evidence, a couple things to say about this. First of all, there was a discovery sanction in this case. The testimony was not allowed, not because it wasn't relevant particularly, although I think there's a question about relevance, but more fundamentally because they hadn't disclosed that this was going to be part of the case at the appropriate time. There is no basis on which to argue that the judge abused his discretion under those circumstances. Let me ask you a question. In looking at Judge Ward's order, it seems to me that he awarded damages twice for a Rule 37 violation. That is, while he referenced the half million dollars based on contempt under Rule 37, Rule 37 talks about sanctions. I'm talking about the 567 plus the 500,000 equaling about $1.1 million. Isn't there a problem with how he reasoned in connection with the $500,000? I didn't think so because I thought he derived that from his inherent authority to regulate the proceedings before the court. But when he made his final order, he clearly referenced sanctions under Rule 37 as I read his order. Is that problematic for you at all? I don't think so. I think he's entitled to impose whatever sanctions he thinks is appropriate. It's not double sanctioning for exactly the same conduct. These are designed to sanction for specific differences in terms of the deterrent message he's trying to send the defendants in this particular case. And then Mr. Pincus' arguments with respect to damages. I understand the sort of rhetorical point that their profits were a certain number and our profits would have been a much bigger number and shouldn't you use their numbers. But I think the court clearly understood that we're talking about an extraordinary case of price erosion. There's no question. Before we started, we had $60 to $100 prices. Now, the expert didn't use that for the purpose of creating his model. But the jury was certainly allowed to use that as a basis for assuming what the number was going to look like in the but-for world. And then you have this unbelievably extraordinary circumstance where they actually are selling them during the period of infringement. And in that situation, again, the price spikes up. They keep talking about real-world economics. It is hard for me to imagine what could be more evidence of real-world economics than the actual conduct. If we had been allowed to use our patent to exclude them from the market because we had no interest in licensing them, there is no question that we would have gone forward under those circumstances. And the jury found no non-infringing substitutes. That's a question of fact. This, as we all understand, is primarily a price erosion case. And the jury evidently set the price at $81, which was based on the shortage period in 2010. But as a matter of economics, at that price, could they have sold every single product that was on the market? If the price goes up, we know that the demand goes down. Well, it does. It depends on the elasticity of it. And, again, there was direct testimony. Are you saying the elasticity is zero here? No, no. I don't think you have to go to that because $81 doesn't take you to that level. But what you do know is that the efficiency and space savings of this particular invention save, in fact, hundreds of dollars to the downstream customers. So the idea of paying 80-some dollars when you're going to save hundreds of dollars is a perfectly rational decision to make. And, therefore, they would have continued to do it under those circumstances. But the market before and after was considerably lower in the $30 and $40 range. Wouldn't a good many of these purchasers not have purchased at all but maybe have waited for the price to come down? Would you have made all those sales at that price? That's what you have to prove. Well, no, but there's no evidence to the contrary. We made all those sales at the time during that period of spike. Every sale that Cisco needed, we made all of those sales. I mean, we certainly could have provided it. But, of course, you're extending that 2010 price far beyond the shortage period. And that's where I'm asking, would you have sold it and made every sale at $81 when there were no longer shortages in the market? Well, the only reason there weren't shortages in the market is because they're infringing our patent. So as long as they're being told they cannot infringe our patents and the jury found, and quite properly so, that there are no suitable non-infringing alternatives, the market's not going to wait. When you're talking about products that are worth hundreds of thousands and millions of dollars, the market's going to want to have those products in place and operating. And under those circumstances, the court should affirm. Thank you. Thank you, Mr. Phillips. Mr. Dunner, you have a couple minutes. Yes, thank you, Your Honor. I'd like to deal with four points. One, Mr. Phillips said there was no expert. The fact is, there were two experts. There was Dr. Mercer, Dr. McAllister. Dr. Mercer went through Arduini point by point, element by element. While he did so in an anticipation context, not an obviousness context, the issue is, we say that the switching regulators are actually disclosed. He showed how they are actually disclosed. He showed how they can be substituted. So there was plenty of expert testimony. And Dr. McAllister talked about the Mamano reference, the 12-volt reference. Aside from the fact that there doesn't have to be expert testimony, even Syncor has admitted there are cases where you don't have to have it. The issues involved here that he says required expert testimony were not complex issues. The issues of whether a switching regulator is disclosed is not complex, and Dr. Mercer went through it point by point. Didn't Mr. Phillips give us an accurate statement of our law on secondary considerations, though, that we don't really require the secondary considerations to be linked to the minor advance, particularly when there's two or three advances in this invention? It's tied to the claimed invention, isn't it? Your Honor, on page 18 of our gray brief, J.T. Eaton v. Atlantic Paste & Glue, quote, the asserted commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art. What was readily available in the prior art was everything except switching regulators, arguably, and 12 volts. So I think his statement is not a reflection of what the course of law is. But those switching regulators are in what he called a magnificent new array, the second isolation. Why doesn't that sound a little more plaintive, clearly, that what we have here is an entire invention, not a minuscule advance? Mr. Phillips has a way with words. It was not an extraordinary invention. It was not magnificent to anything. It was taking Arduini and tweaking it in two spots, one of which was expressly taught, the switching regulators, and the 12 volts from Dr. Schlecht's own mouth were actually better. The mouse says it was better than the alternative. And when he talked about Dr. Schlecht's discussion of 4 volts, which responded to your question, Your Honor, he was talking about LDOs, linear regulators. He never said that 4 volts would be useful with switching. But this is a jury, Mr. Dunner. Pardon? We're into the facts now, factual findings underpinning the obviousness. We've got to take the jury's call on that, don't we? All the jury had before it was Dr. Schlecht saying 4 volts would not use 12 volts with a linear regulator. That wasn't the issue. Would you use 12 volts with a switching regulator? So there's no evidence there. And the only evidence before the jury was that 12 volts was normal, was conventional, and was advantageous to other voltages. So there's no substantial evidence of anything other than 12 volts. So you're saying the evidence is insufficient to support the jury's findings? Is that what you're saying? I am saying that, Your Honor, on the 12-volt point. On the other point, I think there's an express teaching. I don't think you need to worry about the jury's findings. The very last point on willfulness, I see my time has expired, but I'd just like to make the last point. Synchro waived willfulness. So if Mr. Phillips says that the judge's use of the word egregious— He did use that word egregious. Does that invoke the extraordinary case of 287? I don't think so, Your Honor. And moreover, they waived willfulness, and they say they waived it only for the pre-injunction period. They waived it, period, and they never took it back. With that, Your Honor. Thank you, Mr. Gunner. Mr. Schmidt. If I may. Thank you, Your Honor. I just want to make four quick points. First of all, I think it was Mr. Phillips who said that the connection is miles away. The connection is not miles away. You have a circuit board. You put it into the rack. The connection is made, and that allows electrons to flow into the bus converter from the output side, input to output. Wasn't that figurative miles away? Well, I was taking him literally, but I wanted to make sure the call was clear. We're talking inches away, not miles away. This is a big converter. Well, the system is very big, but the distance from the board to the rack is very small. The second point is the evidence of the work that the defendants were doing to switch to fully regulated converters— and by the way, we have now totally switched over to fully regulated converters—was disclosed. These activities took place in the summer. They took place in the fall, and they were disclosed as they happened. They were disclosed in the expert reports. The experts were deposed about them, and so they were actually disclosed in real time. Now, the discovery cutoff for facts was in August, but the parties continued to produce evidence as it happened during the fall. Third, we were not precluded from presenting this evidence based on a discovery sanction, and I'll just refer to two of the orders from Judge Ward. At A1300, this was an oral order at court where, at first, Judge Ward said, Mr. Ballenger cannot testify about the awards—that's the process that was happening in the fall— but can testify about what Cisco would have done in 2006 to 2009. He cautioned Mr. Ryan not to open the door by saying, quote, you haven't done anything, and then ultimately, he later, then at A1521, later in the transcript, he then said, I'm not going to allow Mr. Ballenger to testify to anything that's a hypothetical question, e.g., what he would have done in the but-for world. Those are the rulings that took place during trial but not based on a discovery sanction. It was his view that Mr. Ballenger was biased, being Cisco, and Cisco is, you know, accused of infringement, but Dr. Schlecht was allowed to testify that he didn't think that Cisco could turn to a non-infringing alternative, and who's more biased than Dr. Schlecht on the plaintiff's side? That was a probative issue that should have gone to the jury, and as—moving to my fourth point, as Your Honor said, there was a market for fully regulated at $30 to $40. The unregulated was going to be less than that, but in the but-for world, it's now $80. And that would have been the motivation for the defendants and for Cisco, the customer, to move to the fully regulated device so they could not be buying products at an $80 price but down in the $30 or $40 range. And Mr. Ballenger testified that he saw no technical reason that defendants could not move to fully regulated boards. Ultimately, that's a fact question, which the jury should have heard and been able to make a decision, and that would have been the balance to the price erosion argument. Yes, prices go up, so what do the defendants do? Do they just walk away from the market for 12 years? No. As Green Processing said, a rational person in this position would look to stay in the market with what they could do, and what they could have done was taken fully regulated converters that predated unregulators, were sold the entire time period in parallel that Cisco had used— Mr. Smith, I think your time has expired. Thank you, Your Honor. Thank you very much. Mr. Pincus? Thank you, Your Honor. I'll also make four points. Starting with damages, again, Mr. Smith's talking about the evidence that wasn't admitted. Talking just about the evidence that was admitted, I think Mr. Phillips is right. This is an extraordinary case given the ratio of real profits to the claimed price erosion profits. The problem is it's an extraordinary case without the necessary proof. All that they rely on is a short-term—sales at a price that everyone agrees was at that price because of a short-term market insufficiency. They have not been able to show that that price would have prevailed for four years. That is their burden. Why was the market insufficient at that time? Because the line had closed down. There was a shortage in the market. And wouldn't there have been a shortage in the market if all the infringers were taken off? But then the question is, what about the alternatives? And they would have had to show, which they also failed to show, that none of these alternatives were— Is it their burden or your burden to show that? I think it's both their burden. What the court has said is price erosion is made up of two things. It's the price— Well, they came forth with some proof. Didn't you have to come forth and say, no, that wouldn't have happened for these reasons? Yes, and we did. On the 2010 price, we explained that that price shows nothing about what would happen. With respect to alternatives— Now, we're in facts, so juries are going to decide those, right? We're in facts, Your Honor, but I think we're in facts where there's really nothing because all of the statements that they rely on in their brief from customers and other third parties about the supposed great benefits of their alternative, each one of those people who is not affiliated with the defendants said price was important. And so they can hardly say, as you pointed out, that there was a zero price elasticity here. Their version of the world is Cisco would not have bought one item less based on that proof when fully regulated was on the market. There's evidence that we recite in our brief about the availability, about other customers specifically saying they would use those alternatives, and Syncor itself saying, yes, in our marketing, we recognize that those are alternatives. That's pretty powerful against nothing except the short-term price when we're talking about this extraordinary amount of money. Two other quick points, if I may, on enhancement. I think the other issue is if there was egregiousness, there's a jury issue there. That's something that would have to be found by a jury, I believe, and it wasn't. On inducement, in our colloquy, Your Honor, we talked about the jury instructions. We didn't talk about sufficiency of the evidence. There's a significant problem here on sufficiency of the evidence in terms of actual knowledge because all of the evidence is basically three years ago you saw a Syncor data sheet. Therefore, the jury can infer that you have been carefully monitoring and actually know of every development in Syncor products. If that is sufficient to meet GlobalTek, GlobalTek becomes meaningful. They knew of the parent application, didn't they? Excuse me, Your Honor? They knew of the parent application. They knew of the parent application. It's a continuation, so you knew what the subject matter was. But there's no evidence that they were looking at that. There's no evidence. Most every company does some monitoring of what its competitor does. If once you monitor once, that's enough to get to a jury on GlobalTek. GlobalTek doesn't mean very much. Are you digging yourself a hole? I don't think so, Your Honor. Thank you. Thank you, Mr. Pincus. Our next case this morning is Road and Highway Builders v. The United States.